1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    CHERYL BELLONI,                          Case No.  13-cv-03509-KAW

            Plaintiff,
8                                              ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S
9        v.                                    MOTION FOR PARTIAL SUMMARY
                                               JUDGMENT
10   THE ROMAN CATHOLIC ARCHBISHOP
     OF SAN FRANCISCO,                         Dkt. No. 45
11
            Defendant.
12

13          On July 30, 2013, Plaintiff Cheryl Belloni filed this action against the Roman Catholic

14   Archbishop of San Francisco alleging that she was wrongfully terminated from her position at St.

15   Isabella Church.  On October 30, 2014, Defendant filed its motion for partial summary judgment,

16   which is limited to the three discrimination causes of action.  (Def.'s Mot., Dkt. No. 45.)

17          On December 18, 2014, the Court held a hearing, and after careful consideration of the

18   parties' arguments, and for the reasons set forth below, the Court GRANTS IN PART AND

19   DENIES IN PART Defendant's Motion for Partial Summary Judgment.

20                                  I.   BACKGROUND

21          Unless otherwise noted, the following facts are undisputed.  Plaintiff Cheryl Belloni is a

22   Caucasian woman who began working for St. Isabella Church in 1980 as a part-time secretary, and

23   became the full-time parish secretary in 1982.  St. Isabella is part of the Archdiocese of San

24   Francisco.  The parish secretary position involved various responsibilities, including human

25   resources and bookkeeping duties.  (Dep. of Fr. Mark Reburiano, "Reburiano Dep.," Decl. of John

26   McGuinn in Opp'n to Def.'s Mot. for Summary J., "McGuinn Decl.," Dkt. No. 54-3, Ex. 5 at

27   130:20-131:15.)

28          Plaintiff served as parish secretary to five pastors during her 30-year tenure at St. Isabella.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiff had no record of discipline prior to Fr. Mark Reburiano's ("Fr. Mark" or "Reburiano")

2    appointment as pastor on July 1, 2011. (Ruburiano Dep. 94:7-20.)  Additionally, Plaintiff claims

3    that she had never been previously accused of being disrespectful, negative or insubordinate.

4    (Decl. of Cheryl Belloni, "Belloni Decl.," Dkt. No. 54-1 ¶ 3.)

5         From July 2008 to June 2011, Fr. Ken Westray ("Fr. Ken") served as pastor. (Dep. of Fr.

6    Kenneth M. Westray, "Def.'s Westray Dep.," Decl. of Lori Sebransky in support of Def.'s Mot.

7    for Partial Summary J., "Sebransky Decl.," Dkt. No. 48-3, Ex. 3 at 23:25-24:4.)  Defendant

8    contends that Fr. Ken also had negative interactions with Plaintiff, but he never "wrote up"

9    Plaintiff or any other employees at St. Isabella. (Def.'s Westray Dep. 124:18-125:6.)  Fr. Ken,

10   however, testified that Plaintiff was a "trusted and competent employee," a "dependable worker,"

11   was "hard working and professional," and agreed that "she has always gone above and beyond to

12   serve our parish as an employee, parishioner and minister." (Dep. of Fr. Kenneth M. Westray,

13   "Pl.'s Westray Dep.," McGuinn Decl., Ex. 4 at 48:24-49:1, 49:23-50:1, 51:10-14, 57:3-10.)  Fr.

14   Ken also acknowledged that Plaintiff had a reputation of being "a compassionate, hard working

15   and professional secretary at St. Isabella." *Id.* at 55:13-20.  Fr. Ken testified that he never

16   considered terminating Plaintiff nor had given "any thought to putting together any kind of written

17   warning or reprimand for her." *Id.* at 126:13-17; 72:15-73:13.  During his tenure as pastor, Fr. Ken

18   approved Plaintiff's request to telecommute two days per week. (Def.'s Westray Dep. 128:16-

19   129:4.)

20        Fr. Mark Reburiano ("Fr. Mark" or "Reburiano") was appointed pastor on July 1, 2011.

21   Fr. Mark is Filipino and was 36 years old at the time of his appointment. (Reburiano Dep., "Def.'s

22   Reburiano Dep.," Sebransky Decl., Ex. 4 at 18:18-19:1.)  Fr. Mark had previously served as an

23   associate pastor at two Archdiocesan parishes.  *Id.* at 27:19-23, 28:11-15, 31:8-13.

24        Between July 2011 and October 2012, Plaintiff received six to eight verbal reprimands

25   from Fr. Mark. (Dep. of Cheryl Belloni, "Def.'s Belloni Dep.," Sebransky Decl., Ex. 2 at 32:6-11.)

26   One reprimand in July 2011 was for a comment Plaintiff made to Karen McFadden, a coworker,

27   regarding Fr. Mark's instruction that they change the location of where they counted the

28   collections. (Def.'s Belloni Dep. 32:12-33:3.)  Fr. Mark told Plaintiff that he believed that her

2

United States District Court
Northern District of California

1   comments and tone of voice to be disrespectful towards him. (Def.'s Belloni Dep. 33:17-21;

2   Def.'s Reburiano Dep. 175:1-178:24.)

3        On another occasion in 2011, Fr. Mark and Plaintiff had a discussion about discontinuing

4   payments for Deacon Jim Myers. (Def.'s Belloni Dep. at 56:13-57:25.)  Plaintiff believed that

5   Deacon Myers should receive the stipend he had been receiving for 10 years, and Fr. Mark

6   disagreed, because the other deacon, who was retired, did not receive a stipend. (Def.'s Belloni

7   Dep. at 59:11-23.)  Plaintiff testified, however, that while she disagreed with Fr. Mark, she did not

8   verbally disagree with Fr. Mark. *Id.*

9        In February 2012, Fr. Mark rescinded Plaintiff's telecommuting arrangement, because he

10   insisted that being the parish "gatekeeper" required her physical presence in the office five days a

11   week. (Belloni Decl. ¶ 19; Pl.'s Reburiano Dep. 102:23-103:10, 126:13-127:10.)  Plaintiff claims

12   that Fr. Mark told her that he spoke with the Archdiocese Human Resources department, and was

13   told that the officer manager needed to be in the office five days a week. (Belloni Decl. ¶ 19; *see*

14   Pl.'s Reburiano Dep. 348:2-22.)  Patrick Schmidt, the Archdiocese's Director of Human

15   Resources, testified that he never told Fr. Mark that an office manager had to be physically present

16   and that it was up to the individual pastor to decide whether to permit telecommuting.  (Dep.

17   Patrick Michael Schmidt, "Pl.'s Schmidt Dep.," McGuinn Decl., Ex. 11 at 83:21-84:6.)

18        In October 2012, Fr. Mark asked Plaintiff why some employees received Costco

19   memberships. (Def.'s Belloni Dep. at 64:8-66:12.)  Plaintiff explained and Fr. Mark decided that it

20   was an expense that should not be borne by the parish and those employees reimbursed St.

21   Isabella. *Id.* at 66:16-21.  Plaintiff testified that she then told Fr. Mark that he was disrespecting

22   the staff by giving the two associate pastors $250 Christmas bonuses, but not extending what had

23   become customary benefits and a small bonus to the other staff when they were also being denied

24   a cost of living increase. *Id.* at 69:14-70:16.  She had also been hurt that she had not heard from

25   Fr. Mark when she was out on medical leave. *Id.*  Fr. Mark testified that Plaintiff left that meeting

26   abruptly before Fr. Mark had concluded the discussion. (Def.'s Reburiano Dep. at 201:17-202:15,

27   208:7-24.)  Plaintiff testified that she had a physical therapy appointment, of which Fr. Mark was

28   already aware, that necessitated her departure. (Def.'s Belloni Dep. at 70:17-71:8.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Archdiocese provides training to new pastors regarding managing employee performance and avoiding unlawful discrimination.  (Pl.'s Schmidt Dep. 35:5-14.)  During those training sessions, HR stressed the importance of documenting perceived performance problems.  (*Id.* at 39:19-24; Pl.'s Reburiano Dep. 54:10-15; Pl.'s Westray Dep. 73:6-9.)  Fr. Mark testified that in the trainings "they always say document, document, document. They could not emphasize that more." (Pl.'s Reburiano Dep. 54:10-15.)  Likewise, Patrick Schmidt, Defendant's Director of Human Resources, concluded "[i]f it's not documented, it didn't happen." (Pl.'s Schmidt Dep., 39:25-40:6.)  Despite this policy, Fr. Mark never documented any perceived performance issues with Plaintiff prior to October 24, 2012, when he typed and emailed his accusations against Plaintiff to Mr. Schmidt, Defendant's then-Associate Director of Human Resources.  (10/24/12 Email, Pl.'s Schmidt Dep., Ex. 6.)

Thereafter, on November 6, 2012, Fr. Mark gave Plaintiff a written warning letter. (Warning Letter, McGuinn Decl., Ex. 12.)  Plaintiff testified that Fr. Mark did not discuss the letter with Plaintiff, but he insisted that she read and sign to confirm receipt. (Pl.'s Belloni Dep. 94:4-96:10.)  The letter stated that Fr. Mark has "received many complaints from your coworkers and others that you have dealt with them in a rude and unfriendly manner." (Warning Letter at 1.) The letter did not specify who the "others" were, but warned that "[i]f there are any further outbursts of this kind, your employment will be terminated immediately." *Id.*  Fr. Mark then gave Plaintiff thirty days to make "a substantial improvement" in terms of her behavior. *Id.*  After making Plaintiff sign the letter, Fr. Mark refused Plaintiff's request for a copy, even though the letter was written and addressed to her. (Pl.'s Belloni Dep. 94:11-96:15.)

Despite Fr. Mark's previous communications with Mr. Schmidt, Human Resources did not receive a draft of this letter nor were they aware of it until Plaintiff contacted them on November 7, 2012 to request a copy.  (Pl.'s Schmidt Dep. 97:1-6, Ex. 8.)  Fr. Mark later gave Plaintiff a copy of the letter after he was instructed to do so by HR.  (Pl.'s Belloni Dep. 96:13-17; Pl.'s Schmidt Dep., Ex. 8.)

On November 12, 2012, Plaintiff wrote Fr. Mark a letter in response, in which she apologized to him and asked him to allow her to apologize to those who felt she had been

1  unfriendly. (Pl.'s Belloni Dep. 98:10-99:21; Letter, McGuinn Decl., Ex. 13.) According to

2  Plaintiff, Fr. Mark did not acknowledge her apology until he terminated her employment on

3  November 30, 2012. (Pl.'s Belloni Dep. 100:15-18.)

4          On November 29, 2012, Plaintiff contacted Mr. Schmidt to discuss her situation with Fr.

5  Mark, the November 6 warning letter, and her November 12 letter, to which she had received no

6  response.  (Pl.'s Schmidt Dep., Ex. 9.)  Later that day, Fr. Mark sent Mr. Schmidt the text of the

7  November 6, 2012 letter in an email.  (Pl.'s Schmidt Dep., Ex. 10.)  Mr. Schmidt emailed Fr. Mark

8  to inform him that he had spoken to Plaintiff, who was upset, but that he had received positive

9  feedback and believed that she was "willing to come around." (Pl.'s Schmidt Dep. 111:23-

10  112:12.)  Mr. Schmidt had no idea that Fr. Mark was going to terminate Plaintiff the following

11  day. *Id.*

12          On November 30, 2012, Plaintiff's employment was terminated, but she would be paid

13  through December 31, 2012. (Def.'s Reburiano Dep. 210:14-211:19.)  Also on November 30,

14  2012, Fr. Mark offered Clarence Mamaril, a Filipino man, the position of interim parish secretary.

15  (Pl.'s Reburiano Dep. 330:20-331:1, 341:24-344:2.)  Mr. Mamaril had worked as Parish Council

16  Youth Director and a staff musician at St. Isabella since 2000. (Decl. of Clarence Mamaril,

17  "Mamaril Decl.," Dkt. No. 46 ¶ 2.)  Fr. Mark offered the position without inquiring about Mr.

18  Mamaril's qualifications to carry out the duties. (Pl.'s Reburiano Dep. 330:20-331:1, 341:24-

19  344:2.)  In fact, Fr. Mark testified that he knew Mr. Mamaril had no prior experience as a secretary

20  when he offered him the position. *Id.*at 341:24-342:1.  He also testified that he did not know

21  whether Mr. Mamaril had experience with bookkeeping, payroll, or human resource functions.  *Id.*

22  at 342:2-344:2.  In selecting Mr. Mamaril, Fr. Mark passed over Karen McFadden, a Caucasian

23  woman who had performed Plaintiff's job while she was out on medical leave, for the interim

24  parish secretary position because he believed that she was unqualified due to her perceived

25  negative attitude. (*Id.* at 344:3-23; Mamaril Decl. ¶ 3.)  In November 2013, Defendant hired

26  Steven Pilc to do the accounting portion of Plaintiff's job because Fr. Mark realized Mr. Mamaril

27  could not do it. *Id.* at 350:17-25, 351:20-352:10.

28          Today, Mr. Mamaril remains "interim" parish secretary and works 22 hours per week.

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   (Pl.'s Reburiano Dep., 331:8-10, 347:23-348:1; Dep. of Clarence Mamaril, "Pl.'s Mamaril Dep.,"

2   McGuinn Decl., Ex. 3 at 38:2-14; 39:17-21.)  Mr. Mamaril's works a flexible schedule, which

3   allows him to continue operating his private law practice while also performing his parish

4   secretary duties. (Pl.'s Mamaril Dep. 51:7-11.) If his secretarial duties conflict with his law

5   practice, he informs Fr. Mark that he will make up the time. *Id.*  Additionally, Mr. Mamaril has

6   used the parish office for his law practice by taking calls and meeting with clients at the rectory

7   office. (Pl.'s Mamaril Dep. 52:21-53:6; Pl.'s Reburiano Dep. 349:22-25.)  Fr. Mark has also

8   permitted Mr. Mamaril to stay in the priest quarters approximately 15-20 times, so that he would

9   not have to commute to his home in Napa County.  (Pl.'s Mamaril Depo. 84:5-22.)

10         After Plaintiff's termination, she applied for unemployment benefits.  (Belloni Decl. ¶ 27.)

11  Although Plaintiff was told by Defendant's then-Director of Human Resources that the

12  Archdiocese would not prevent her from collecting unemployment benefits, Fr. Mark instructed

13  Mr. Mamaril to file a letter in response to Belloni's unemployment insurance claim, which

14  included the November 6, 2012 warning letter.  (*Id.*; Pl.'s Mamaril Dep. 90:6-91:1; 1/14/2013

15  Letter to the Employment Development Department, McGuinn Decl., Ex. 15.)  When Plaintiff's

16  benefits were denied, she contacted the Archdiocese's Human Resources department, who implied

17  that there must have been some mistake and subsequently her benefits were awarded. (Belloni

18  Decl. ¶ 27.)

19         On July 30, 2013, Plaintiff filed a complaint alleging five causes of action: (1)

20  Discrimination on the Basis of Race and National Origin; (2) Gender Discrimination; (3) Age

21  Discrimination; (4) Violation of California Labor Code § 226; and (5) Violation of California

22  Labor Code § 2802.  On October 9, 2013, Plaintiff filed an amended complaint. (First Am.

23  Compl., "FAC," Dkt. No. 16.)

24         On October 30, 2014, Defendant filed a motion for partial summary judgment as to the

25  first three causes of action. (Def.'s Mot., Dkt. No. 45.)  On November 26, 2014, Plaintiff filed her

26  amended opposition, in which she conceded that she could not make a prima facie case for age

27  discrimination. (Pl.'s Opp'n, Dkt. No. 55 at 1 n. 1.)  On December 5, 2014, Defendant filed its

28  reply. (Def.'s Reply, Dkt. No. 57.)

## II.  LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, it may discharge its burden of production by either (1) by "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.  "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254.  "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted).  The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the

1  dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Conclusory or

2  speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of

3  material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics*

4  *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

5       In deciding a motion for summary judgment, a court must view the evidence in the light

6  most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,*

7  477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

8                                    **III. DISCUSSION**

9  **A.  The Merits of Defendant's Motion for Summary Judgment**

10      Defendant seeks summary judgment as to the first, second and third causes of action for

11  race and gender discrimination and wrongful termination in violation of Title VII and age

12  discrimination in violation of the Age Discrimination in Employment Act ("ADEA").

13      Title VII makes it unlawful for an employer to "discriminate against any individual with

14  respect to his compensation, terms, conditions, or privileges of employment, because of such

15  individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2.  Title VII claims

16  involving alleged discrimination and retaliation are both governed by a burden-shifting

17  framework.

18      A disparate treatment claim must be supported by direct evidence of discrimination, or

19  may instead be evaluated under the burden-of-proof-and production analysis set forth in

20  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

21      **1.  Age Discrimination Claim**

22      In her opposition, Plaintiff concedes that she cannot meet her burden of making a prima

23  facie showing for age discrimination under the ADEA. (Pl.'s Opp'n at 1 n. 1.)  Accordingly, the

24  motion for summary judgment is granted as to the third cause of action.

25      **2.  Gender Discrimination Claims**

26      Here, Plaintiff has presented no direct evidence of disparate treatment. Thus, she can

27  survive summary judgment on her discrimination claims only if she first provides sufficient

28  evidence to establish a prima facie case of discrimination. If she succeeds, the burden shifts to

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1   Defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.  If

2   Defendant successfully carries that burden, the ultimate burden shifts to Plaintiff to raise a triable

3   issue of material fact as to whether the proffered reasons for the adverse action are a mere pretext

4   for unlawful discrimination. *See Shelley v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012).

5   Notwithstanding the burden-shifting, the ultimate burden of proof remains with Plaintiff to show

6   that Defendant intentionally discriminated against her based on her race. *Coleman v. Quaker Oats*

7   *Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

8         The Archdiocese argues that the court should grant summary judgment because even if

9   Plaintiff could establish a prima facie case of discrimination on the basis of race, she cannot

10   establish a triable issue with regard to whether the articulated reason for her termination was

11   pretextual. (Def.'s Mot. at 22.)

12         To establish a prima facie case of discrimination through circumstantial evidence, Plaintiff

13   must show that (1) she was a member of the protected class; (2) that she suffered an adverse

14   employment action; (3) that at the time of the adverse action she was satisfactorily performing her

15   job; and (4) that she was replaced in that position by a person outside the protected class who had

16   equal or inferior qualifications, or was discharged under circumstances otherwise giving rise to an

17   inference of discrimination. *See Diaz v. Eagle Produce, Ltd. Partnership*, 521 F.3d 1201, 1207

18   (9th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000);

19   *Pottenger v. Potlach Corp.*, 329 F.3d 740, 745-46 (9th Cir. 2003).

20         The Ninth Circuit has repeatedly noted that "[t]he burden of establishing a prima facie case

21   of disparate treatment is not onerous." *See, e.g., Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.

22   2002) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  On summary

23   judgment, the degree of proof necessary to establish a prima facie case "is minimal and does not

24   even rise to the level of a preponderance of the evidence." *Schechner v. KPIX-TV*, 686 F.3d 1018,

25   1025 (9th Cir. 2012) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

26         Here, Defendant argues that even if Plaintiff could establish a prima facie case of

27   discrimination, she cannot establish that a triable issue of fact that Fr. Mark's reasons for her

28   termination were pretextual. (Def.'s Mot. at 22.)  In its reply, Defendant assumes, and the Court

agrees, that Plaintiff can establish a prima facie case for her gender and race discrimination claims, because she is a Caucasian woman, who was terminated from her employment despite adequately performing her duties, and was replaced with a Filipino male.  Accordingly, the Court is left only to address whether a triable issue exists to preclude summary judgment as to whether Plaintiff's termination was pretextual. (*See* Def.'s Reply at 1 n. 1.)

   a.   Legitimate, Nondiscriminatory Reason

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for its employment decision. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007); *see also Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1106 (9th Cir. 2008). Once that burden is met, the inference of discrimination or retaliation raised by the prima facie case is dispelled. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). The plaintiff must then provide evidence showing that the asserted reason was a pretext for unlawful discrimination or retaliation. *Reeves*, 530 U.S. at 146-50.

Defendant asserts that to the extent that Plaintiff has met the elements of the prima facie case, it has articulated a legitimate business reason for the termination– Plaintiff's insubordination and disrespectful behavior– and Plaintiff has no substantial evidence showing that the decision was motivated by some discriminatory motive. (Def.'s Reply at 1.)  Defendant contends that the testimony of Fr. Mark, Fr. Ken, and Michael Mangini is undisputed, and establishes that Plaintiff's termination was for a legitimate, nondiscriminatory reason.  As Defendant has shown a legitimate, nondiscriminatory reason for its actions, the burden shifts back to Plaintiff, who must demonstrate that Fr. Mark's reasons for the adverse employment decision is a pretext for a discriminatory motive.

   b.   Pretext

A plaintiff can show pretext "either (1) directly by persuading the court that a discriminatory reason more likely motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Examples of direct evidence of discriminatory conduct include "comments from supervisors betraying bias or animus against [minority] workers." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113

United States District Court
Northern District of California

10

1   (9th Cir. 2011).  On the other hand, "circumstantial evidence . . . tends to show that the employer's

2   proffered motives were not the actual motives because they are inconsistent or otherwise not

3   believable." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). "Where the

4   evidence of pretext is circumstantial, rather than direct, the plaintiff must present 'specific' and

5   'substantial' facts showing that there is a genuine issue for trial." *Noyes v. Kelly Services*, 488

6   F.3d 1163, 1170 (9th Cir. 2007) (quoting *Godwin*, 150 F.3d at 122). "However, . . . in the context

7   of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is 'hardly an

8   onerous one.'" *Noyes,* 488 F.3d at 1170 (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080

9   (9th Cir. 1997)).

10
11               *i.   Fr. Mark's treatment of Plaintiff and other women is indicative of discrimination*

12         It is undisputed that Fr. Mark treated Plaintiff and other female employees differently than

13   the male employees.  Fr. Mark allowed men into the priest quarters, and did not allow women.

14   (Belloni Decl. ¶ 14.)  The issue is whether this difference in treatment was discriminatory.

15         Further, it undisputed that Plaintiff is a Caucasian woman who was replaced with a

16   Filipino man who, for the purposes of this motion, was not qualified to perform all of the duties of

17   parish secretary.  Fr. Mark hired Mr. Mamaril despite Fr. Mark's knowledge that he had no

18   secretarial experience, and without knowing whether he was qualified to perform the other job

19   responsibilities.  Fr. Mark testified that he instantly hired Mr. Mamaril, because he did not have a

20   secretarial replacement lined up for the next day. (Def.'s Reburiano Dep. 330:20-331:10.)  In

21   hiring Mr. Mamaril, Fr. Mark passed over Karen McFadden, another Caucasian female, for the

22   interim parish secretary position, even though she had previously performed those duties when

23   Plaintiff was on disability leave. (Pl.'s Reburiano Dep. 344:3-23.)  Despite Mr. Mamaril's

24   shortcomings—which required hiring another staff member to do the bookkeeping—he is still

25   serving as interim parish secretary almost two years later. (*See* Pl.'s Reburiano Dep. 350:17-25,

26   351:20-352:10.)

27         In addition, Fr. Mark's termination of Plaintiff's telecommuting agreement was done under

28

United States District Court
Northern District of California

11

the guise of instruction from HR,[1] but he currently allows Mr. Mamaril to maintain a flexible, part-time schedule despite previous claims that he needed Plaintiff physically present in the office five days per week.  (Pl.'s Reburiano Dep. 347:23-348:1; Pl.'s Mamaril Dep., 38:2-14; 39:17-21, 51:7-11.)  Why Fr. Mark now believes that the office manager need not be available to answer phones and greet visitors, when this was previously integral to the gatekeeping role of parish secretary, is uncertain.

Additionally, Plaintiff contends that Fr. Mark treated Plaintiff and other female employees differently than male staff members, as his conversations with female staff he was rude and short with them, and would cut them off.  (Pl.'s McFadden Dep. 76:16-25; Pl.'s Peters Dep. 40:25-41:4; Pl.'s Belloni Dep. 144:9-15; Belloni Decl. ¶ 5.)  Plaintiff claims that when female staff members asked Fr. Mark questions, or sought clarification which they needed to do their jobs, he would tell them they either didn't need to know the information or would be given information on a "need to know basis."  (Pl.'s Belloni Dep. 144:9-15; Pl.'s McFadden Dep., 76:16-25.)  For example, Plaintiff claims that she once asked Fr. Mark about his schedule, and was reprimanded and told not to question his whereabouts. (Belloni Decl. ¶ 6.)  As parish secretary, however, she was expected to know where the pastor was in case a parishioner needed him or another urgent matter arose. *Id.*  On another occasion, Plaintiff asked for the names of the newly appointed Finance Council members, with whom she would regularly communicate regarding financial issues, and Fr. Mark told her he would give her information on a "need-to-know" basis. (Pl.'s Belloni Dep. 144:9-15.)

On yet another occasion, Fr. Mark asked Karen McFadden, the only other woman who worked in the rectory office, to alert him when a certain individual called, but when she asked him to repeat the person's name, he refused and instead he told her "I will tell you what you need to know.  You don't need to know who." (Dep. of Karen McFadden, "Pl.'s McFadden Dep.," McGuinn Decl., Ex. 9 at 76:16-25.)  Ms. McFadden also testified that Fr. Mark accused her of being impolite and, after Plaintiff's termination, inexplicably began taking job duties away from

---

[1] The Court recognizes that this fact is in dispute, but, for the purposes of this motion, the Court will view this evidence in the light most favorable to Plaintiff.

1    her. (Pl.'s McFadden Dep. 34:10-21, 76:7-25; McFadden Decl., ¶ 6.)  In fact, Fr. Mark testified

2    that Karen McFadden was not considered for the interim secretary position, despite having

3    performed the job successfully for more than three months while Plaintiff was out on medical

4    leave, because Fr. Mark believed that she had an attitude problem. (Pl.'s Reburiano Dep. 344:3-

5    23.)[2]

6            Cathie Peters, a parishioner and staff member for over 30 years, testified that Fr. Mark was

7    unwelcoming, unfriendly, unaccommodating and that she "did not feel welcomed by him in any

8    way to discuss anything." (Dep. of Cathleen Peters, "Pl.'s Peters Dep.," McGuinn Decl., Ex. 8 28:

9    12-29:2, 40:9-10, 106:19-21.)

10           Defendant argues that Fr. Mark offered the parish secretary position to three women,

11   including Linda Myers, who is also Caucasian. (Def.'s Mot. at 11; Def.'s Reburiano Dep. 331:2-

12   332:10, 334:5-336:5.)  Fr. Mark testified that he offered Linda the position in December 2012, and

13   that Deacon Jim Myers was present during that conversation. (Def.'s Reburiano Dep. 334:5-

14   336:5.)  To the contrary, Deacon Myers testified that this meeting never occurred and denied

15   statements Fr. Mark attributed to him. (Dep. of James Myers, "Myers Dep.," McGuinn Decl., Ex.

16   17 at 16:5-21, 18:4-24.)  Thus, whether Fr. Mark offered Mrs. Myers the position, and how that

17   offer, if any, was conveyed, is a genuine dispute of material fact.  For the purposes of this motion,

18   however, the evidence most favorable to Plaintiff is that an offer was never made to Mrs. Myers.

19           Defendant argues that Fr. Mark's hiring of other Caucasian women belies the gender

20   discrimination claim. (Def.'s Mot. at 24-25.)  Plaintiff, in opposition, argues that the same actor

21   defense does not apply, because Fr. Mark did not hire Plaintiff. (Pl.'s Opp'n at 30.)  "[W]here the

22   same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both

23   actions occur within a short period of time, a strong inference arises that there was no

24   discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996).

25   Since Fr. Mark did not hire Plaintiff, the same actor defense does not apply.  Further, that Fr. Mark

26

27   ───────────────

     [2] Defendant implies that Ms. McFadden's testimony and declaration should be discounted because
28   she and Plaintiff are friends. (*See* Def.'s Reply at 4.)  This is a credibility determination the Court
     is not in a position to make because the testimony and declaration are not simply self-serving.

United States District Court
Northern District of California

1    was involved in the hiring of two female employees does not mean that he did not have an

2    improper motive when he terminated Plaintiff, because not only were those positions outside of

3    the rectory, but Fr. Mark did not make both of those hiring decisions unilaterally. (*See* Pl.'s Opp'n

4    at 30.)

5              In comparison, Plaintiff argues that Fr. Mark gave preferential treatment to his male

6    employees. (Pl.'s Opp'n at 22.)  Fr. Mark was allegedly more respectful and friendly during his

7    interactions with male staff. *Id.*  For example, Fr. Mark socialized with male employees, including

8    Mr. Mamaril and Mr. Mangini, in his priest's quarters. (Pl.'s Mamaril Dep. 55:1-4, 56:11-58:5,

9    70:15-20; Pl.'s Reburiano Dep. 252:16-24.)  Women were not extended the same privilege.

10   (Belloni Decl. ¶ 14.)  In its reply, Defendant contends that this "could easily be deemed prudent

11   risk management" instead of being deemed discriminatory. (Def.'s Reply at 11.)  There is no

12   evidence, however, that risk management was Fr. Mark's reason for excluding women from the

13   priest's quarters.  Nonetheless, whether his reasons were discriminatory is a question of fact for

14   the jury.

15                    *ii.  Defendant's explanation is unworthy of credence*

16             Proof that an employer's explanation for an employee's termination is unworthy of

17   credence is circumstantial evidence probative of intentional discrimination.  *Reeves v. Sanderson*

18   *Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  In addition, proof that an employer's criticism

19   of the plaintiff's job performance was unfounded raises a question as to the credibility of the

20   employer's explanation for any adverse action taken against the plaintiff. *Id.* at 148.

21             Here, it is undisputed that Plaintiff competently performed her duties.  Instead,

22   Defendant's stated reason for termination is that Plaintiff was disrespectful and insubordinate.

23   Prior to Fr. Mark becoming pastor, Plaintiff was never told that she was disrespectful, negative or

24   insubordinate and had no record of discipline. (Belloni Decl. ¶ 3; Pl.'s Ruburiano Dep. 94:7-20.)

25   After Fr. Mark joined the parish, Plaintiff was accused of being disrespectful, of making

26   statements that she claims she did not make, and was subjected to what she has characterized as

27   specious discipline. (Pl.'s Opp'n at 15-16.)

28             Despite the contradicting factual allegations, Defendant claims that the there is no dispute

United States District Court
Northern District of California

14

1    of material fact. (Def.'s Mot. at 3.)  Plaintiff, however, cites to an abundance of evidence that she

2    claims suggests that Defendant manufactured the attitude issues which it now asserts were the

3    reasons for Plaintiff's termination. (Pl.'s Opp'n 16-19.)  For example, Plaintiff denies much of the

4    alleged conduct and statements that Fr. Mark attributes to her, including that she was

5    insubordinate when she was informed that the location of the offertory count was changing.

6    (Def.'s Belloni Dep. 32:12-33:21; Def.'s Reburiano Dep. 175:1-178:24.)  Karen McFadden, who

7    witnessed the exchange, denies that Plaintiff made the statements Fr. Mark attributed to her. (Decl.

8    of Karen McFadden, "McFadden Decl.," Dkt. No. 54-2 ¶ 9.)

9        Further, Plaintiff claims that she never treated her coworkers unprofessionally and cites to

10   the testimony of Ms. Peters and the declaration of Ms. McFadden. (Pl.'s Peters Dep. 31:6-17,

11   32:11-33:5; McFadden Decl. ¶ 2.)  Additionally, Plaintiff refutes Mr. Mamaril's contention that

12   she had an attitude and was negative by claiming that he was targeting her for termination. (Pl.'s

13   Opp'n at 18; Pl.'s Peters Dep. 71:13-75:19, 116:5-20, Ex. 3.)  Plaintiff cites an email Ms. Peters

14   sent after Plaintiff's termination that detailed a March 2012 conversation between herself, Mr.

15   Mamaril, and Mr. Mangini. (Pl.'s Peters Dep., Ex. 3.)  Therein, Ms. Peters recounted Mr.

16   Mamaril's purported lists of wrongs Plaintiff perpetuated against him, including her failure to send

17   him an email reminder about a meeting that was already on his calendar. *Id.*  Ms. Peters believed

18   that Mr. Mamaril was targeting Plaintiff for termination just like he had successfully done to

19   others previously. *Id.*

20       Defendant cites to Plaintiff's email exchanges with Ms. McFadden, in which she referred

21   to Fr. Ken as "Dodopastor," called a co-worker (Mike Mangini) a "stupid asshole," and repeatedly

22   called Fr. Mark "Little Caesar." (Def.'s Mot. at 9.)  At the hearing, Defendant confirmed that these

23   emails, and, therefore, Plaintiff's disrespectful nicknames, were unknown to Defendant at the time

24   of Plaintiff's termination.  Accordingly, they are irrelevant to Plaintiff's discrimination claims, are

25   highly prejudicial, and are inadmissible.

26       The Court notes that many of the incidents of alleged insubordination cited by

27   Defendant— including the deacon stipends, Costco cards, bonuses, and the offertory count—

28   concerned her human resources and bookkeeping duties.  It follows then, that she and Fr. Mark

United States District Court
Northern District of California

15

1    would have these conversations, and she would provide her views on those topics.  Moreover, Fr.

2    Mark did not document any incidents of Plaintiff's alleged conduct until he compiled a laundry list

3    of complaints in the email sent to Mr. Schmidt on October 24, 2012. (Pl.'s Schmidt Dep., Ex. 6.)

4    This is despite having received human resources training that emphasized, as Fr. Mark described,

5    documenting everything. (Pl.'s Reburiano Dep. 54:10-15.)  Defendant contends that Fr. Mark kept

6    his own notes outside of her personnel file and then typed them into a single document, which he

7    then sent to the Archdiocese. (Def.'s Reply at 9; Def.'s Reburiano Dep. 362:16-363:8.)  Mr.

8    Schmidt testified that the Archdiocese encourages pastors to "keep notes of their conversations,

9    and if it gets to a serious point, they should have a meeting with that employee, document the

10   summary of what they have had, [and] present that to the employee." (Pl.'s Schmidt Dep. 40:11-

11   19.)  Fr. Mark did not follow protocol, because he did not meet with Plaintiff despite apparently

12   having serious issues with her behavior. Instead, he went directly to HR and provided a list of

13   transgressions dating back to when he became pastor, more than a year prior. (Pl.'s Schmidt Dep.,

14   Ex. 6.)  Also, the Court notes that some of alleged incidents in the October 24, 2012 email do not

15   have dates associated with them. *Id.*  Since the Court must draw all reasonable inferences in favor

16   of the nonmoving party without making any credibility determinations, Fr. Mark's failure to both

17   follow protocol, by not meeting with Plaintiff, and document her alleged transgressions in her

18   personnel file in a more timely manner, could lead a jury to conclude that Fr. Mark's reasons for

19   Plaintiff's termination were exaggerated after the fact and were, therefore, pretextual. *See Reeves*,

20   530 U.S. at 135.

21        All Plaintiff must do to survive summary judgment is to provide "specific, substantial

22   evidence that undermine[s] the credibility of those reasons" given by Defendant for the

23   unfavorable employment action. *Noyes*, 488 F.3d at 1171.  She need not prove the ultimate issue

24   of unlawful discrimination, despite Defendant's contention to the contrary, because that would

25   "erroneously heighten[] the standard on summary judgment." *Id.* at 1172.  Viewing the evidence

26   in the light most favorable to the nonmoving party and drawing all justifiable inferences in her

27   favor, Plaintiff provides specific and substantial facts, outlined above, to raise a question for the

28   jury regarding Defendant's true reasons for her termination. *See* discussion *supra* Part III.A.2.

United States District Court
Northern District of California

1    Accordingly, the question of whether the "real reason" for the decision was unlawful

2    discrimination must go to the jury. *See id.*

3          **3. Race Discrimination Claim**

4          Plaintiff claims that Fr. Mark, who is Filipino, displayed preferential treatment toward

5    Filipinos, including Clarence Mamaril, Fr. Mofan, Fr. Al, and the Filipino community as a whole.

6    (Pl.'s Opp'n at 27.)  Much of the evidenced proffered overlaps with that identified in support of

7    Plaintiff's gender discrimination claim. *See* discussion *supra* Part III.A.2.

8          As provided above, Plaintiff was replaced by Mr. Mamaril, who is Filipino, moments after

9    her termination.  Mr. Mamaril had no prior secretarial experience and limited experience, if any, in

10   the other duties of parish secretary.  Fr. Mark claims that he hired Mr. Mamaril because he did not

11   have anyone to fill in the next day.  That does not explain why Mr. Mamaril remains interim

12   parish secretary.  He was also given the position over Ms. McFadden, who is also Caucasian, and

13   who filled in for Plaintiff while she was out on medical leave. (*See* Mamaril Decl. ¶ 3.)  Since

14   becoming interim parish secretary, Mr. Mamaril has only worked part-time, and has been provided

15   flexibility in both scheduling and his duties that was not extended to Plaintiff.[3]  In fact, the

16   position was restructured a year after Mr. Mamaril took over, and the bookkeeping functions were

17   reassigned to Ms. McFadden's successor, Steven Pilc, because, according to Fr. Mark, Mr.

18   Mamaril did not have time because he was only in the office 20 hours per week. (Pl.'s Reburiano

19   Dep. 350:17-25, 351:20-352:10.)

20         Additionally, Plaintiff generally argues that Fr. Mark treated Filipinos more favorably than

21   Caucasians. (Pl.'s Opp'n at 27.)  Plaintiff states that, "[i]n contrast to the 'management-

22   subordinate' relationship Reburiano had with Plaintiff and the female staff, he and Mamaril were

23   'friends,'" who often went to dinner together.  (Pl.'s Opp'n at 27; Pl.'s Mamaril Dep. 82:6-7,

24   83:10-18.)  Further, Plaintiff claims that Fr. Mark's interactions with Fr. Al and Fr. Mofan, the

25   _____

26   [3] While Defendant claims that Mr. Mamaril's reduced hours are the result of restructuring of the position, Mamaril testified that he was only working 20 hours per week from December 2012 (right after Plaintiff was terminated) to December 2013.  (*Compare* Def.'s Mot. at 19, *with* Pl.'s Mamaril Dep. 39:12-18.) Mr. Pilc was not hired to perform the bookkeeping function, one of Mr. Mamaril's job responsibilities, until November 2013, almost a full year later. (Pl.'s Mamaril Dep. 32:20-25; Pl.'s Reburiano Dep., 350:17-25, 351:20-352:10.)

27

28

United States District Court
Northern District of California

1    two Filipino associate pastors, were pleasant and he would engage them in friendly conversations.

2    (Belloni Decl. ¶ 8; McFadden Decl. ¶ 7.)  In 2011, unlike previous years, Fr. Mark decided that

3    the only employees who would receive  Christmas bonuses were Fr. Al and Fr. Mofan.  (Belloni

4    Decl. ¶ 21; Pl.'s Belloni Dep. 69:19-70:5.)  At the hearing, Plaintiff clarified that $250 was an

5    unusually large bonus for clergy.  Additionally, as to Fr. Mofan, he was arrested and convicted of

6    exposing himself to a park ranger in China Camp State Park in August 2012. (Belloni Decl. ¶ 10.)

7    Thereafter, despite his arrest, Fr. Mofan was included in the Parish Directory by Mr. Mamaril,

8    who was later commended by Fr. Mark for a job well done. *Id.*

9        Defendant argues that you cannot compare Fr. Mark's treatment of clergy to that of non-

10   clergy staff, because they are not similarly-situated. (Def.'s Reply at 10.)  Defendant, citing the

11   Eighth Circuit in *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037, 1038 (8th Cir. 2004),

12   contends that to be similarly-situated, "[t]he plaintiff must compare individuals who have dealt

13   with the same supervisor, have been subject to the same standards, and engaged in the same

14   conduct without any mitigating or distinguishing circumstances." (Def.'s Reply at 7.)  The Ninth

15   Circuit, however, has not adopted the "strict same supervisor" requirement, and has noted that

16   having a different supervisor may be immaterial depending on the circumstances. *Hawn v.*

17   *Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1157-58 (9th Cir. 2010).  Additionally, the Ninth

18   Circuit does not require that employees have the same position to be similarly-situated. *Id.* at

19   1157.  Generally, individuals are similarly situated when they have similar jobs and display

20   similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), as amended

21   (Jan. 2, 2004).  Whether non-clergy staff is similarly situated to clergy staff is a question of fact.

22   *See Hawn*, 615 F.3d at 1157 (citing *Beck v. United Food & Commercial Workers Union Local 99*,

23   506 F.3d 874, 885 n. 5 (9th Cir. 2007)).  Assuming that clergy and non-clergy staff members are

24   not similarly-situated, however, Fr. Mark discontinued the stipend given to Deacon Jim Myers, a

25   Caucasian clergy member, in 2011.  Further, Deacon Myers did not receive a Christmas bonus that

26   year, despite being clergy, even though Fr. Al and Fr. Mofan did.  Since Deacon Myers is male, a

27   juror could make a reasonable inference that his disparate treatment was based on race.  That the

28   only individuals to receive a bonus were Filipino clergy, combined with Mr. Mamaril's

United States District Court
Northern District of California

18

preferential treatment, is specific and substantial enough to show that there is a genuine issue for trial.

While perhaps not as strong as her gender discrimination claim, in viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in her favor, Plaintiff has provided specific and substantial facts to give rise to a reasonable inference of racial discrimination.

**B. Defendants' Objections to Plaintiff's Evidence**

Defendant objects to Plaintiff's Exhibit 6, Plaintiff's Declaration, and the Declaration of Karen McFadden. (Def.'s Reply at 12-15.)

**1. Plaintiff's Exhibit 6**

Plaintiff's Exhibit 6 consists of copies of letters written by parishioners to the Archdiocese and Bishop William J. Justice expressing concern regarding Plaintiff's termination.  (McGuinn Decl., Ex. 6.)  They were produced in response to Defendants' Request for Production of Documents, Set One. (McGuinn Decl. ¶ 8.)

Defendant objects on the grounds that the letters are hearsay and irrelevant under Rules 801 and 802. (Def.'s Reply at 12.)  Relevancy is a broad standard, and the letters concern the parishioners opinions on Plaintiff's professionalism and performance, as well as criticism of Fr. Mark's management and alleged unfair treatment of Plaintiff.  Thus, the letters are surely relevant. At the hearing, Plaintiff argued that the letters were not hearsay, because they were not being offered for the truth of the matter asserted.  Rather, they are offered to show Plaintiff's reputation in the community to rebut Defendant's claim that she had a disrespectful attitude under Rule 405(a).  This is sufficient to overrule the hearsay objection.  At this juncture, however, the Court need not rely on this evidence to make a reasonable inference that Fr. Mark had a discriminatory motive in terminating Plaintiff.

**2. Declaration of Cheryl Belloni**

Defendant objects to several paragraphs on Plaintiff's declaration. (Def.'s Reply at 12-13). As to Paragraph 5, lines 14-16, Defendant objects on the grounds that her statements that Fr. Mark was not open to conversations with "other women," and "seemed as if he preferred not to speak

1   with women at all" lacks foundation under Federal Rules of Evidence 601 and 602. *Id.* at 12.

2   Plaintiff's declaration is based on her experience and her perception of what was happening during

3   her employment, so it does not lack foundation.  Additionally, Defendant objects on the grounds

4   that these statements contradict Plaintiff's response to Special Interrogatory Nos. 1 and 4, and her

5   deposition testimony. *Id.* at 13.  Defendant does not identify the contradiction, but a review of the

6   deposition transcript only provides that Plaintiff testified that she could not idnetify any other facts

7   to suggest that she was terminated because of her gender at that point in time. (Def.'s Belloni Dep.

8   159:6-22.)

9          Similarly, Defendant objects to paragraphs 8 on the grounds that Plaintiff lacks foundation

10  to state that Fr. Mark acted differently with men, because he was more friendly. (Def.'s Reply at

11  13.)  Plaintiff undoubtedly observed Fr. Mark's interactions with men and women, and can

12  provide her observation.  Defendant also claims that this fact is irrelevant.  Whether Fr. Mark gave

13  male staff members preferential treatment is at issue in this litigation, so it is relevant.

14         Defendant objects to paragraph 10 in its entirety on the grounds it lacks foundation and

15  personal knowledge. (Def.'s Reply at 13.)  Paragraph 10 recounts that Mr. Mark solicited Mr.

16  Mamaril's feedback on the Parish Directory, and included Fr. Moran in it despite his recent arrest

17  and conviction, and for which Mr. Mamaril was commended. (Belloni Decl. ¶ 10.)  Defendant

18  does not provide how it believes that Plaintiff does not have personal knowledge or why she lacks

19  foundation.  If called to testify, Plaintiff can testify to these facts.

20         Defendant objects to paragraph 11 in its entirety on the grounds it lacks foundation and

21  personal knowledge. (Def.'s Reply at 13.)  Paragraph 11 concerns Fr. Mark's conduct when

22  Deacon Jim Myers had shoulder surgery, and provides that Fr. Mark visited him at his home and

23  brought him Communion. Plaintiff is aware that this happened and can testify to the foundation of

24  that knowledge further.

25         Defendant objects to a portion of paragraph 12 of Plaintiff's declaration, specifically "To

26  my knowledge, Fr. Mark never asked the parish to pray for my recovery, nor did he inquire as to

27  my well-being."  Defendant objection for lack of personal knowledge is sustained as to this

28  sentence only.

1    Defendant objects to Plaintiff's statement in paragraph 16 that "counting the offertory in

2    the main office had been approved during the last Archdiocesan audit because it is a more secure

3    location" on the grounds that she lacks both foundation and personal knowledge.  (Def.'s Reply at

4    13.)  Defendant appears to contest the accuracy of this statement.  Plaintiff's statement describes

5    her belief at the time of the incident.  Despite Defendant's contention otherwise, Plaintiff does not

6    declare that "Fr. Mark's requested change in procedure was done for any nefarious or

7    discriminatory reason." *Id.*

8    Accordingly, except for as explicitly provided above, Defendant's objections to Plaintiff's

9    declaration are overruled.

10   **3.   Declaration of Karen McFadden**

11   Defendant objects to several paragraphs on Karen McFadden's declaration. (Def.'s Reply

12   at 13-15).  Paragraphs 2 and 3 concern Ms. McFadden's perceptions of how Plaintiff and how Fr.

13   Mark interacted with others. (McFadden Decl. ¶¶ 2-3.)  Defendant objects to both on the grounds

14   that she lacks foundation.  The declaration reflects Ms. McFadden's interpretation of what

15   happened based on numerous interactions.  That Defendant disagrees is not objectionable.

16   Defendant objects to paragraph 6, in which Ms. McFadden states that she voluntarily quit

17   her job because she believed that she was going to be terminated, on the grounds that it is

18   irrelevant and lacks foundation.  Ms. McFadden, however, states that she believed that she was

19   going to be terminated because "Fr. Mark inexplicably began taking away job duties I'd

20   performed for a long time." (McFadden Decl. ¶ 6.)  This is sufficient foundation.

21   Defendant also objects to paragraphs 7 and 8, which concern Fr. Mark's interactions with

22   men, on the grounds that they lack foundation and personal knowledge. (Def.'s Reply at 14.)  Ms.

23   McFadden states that she has witnessed Fr. Mark's interactions, which is sufficient for

24   foundational purposes.  Additionally, Defendant objects to the inclusion of the clergy members in

25   Paragraph 7, because they are not similarly situated.  While that is true, for the limited purpose of

26   paragraph 7, which concerns how Fr. Mark treated male staff generally, Defendant's objection is

27   overruled.

28   Defendant objects to paragraph 9. As to line 11, Defendant claims that Ms. McFadden

United States District Court
Northern District of California

21

lacks foundation as to the statement that "counting in the main office had been approved during the last Archdiocesan audit" and this contradicts her deposition testimony that she did not had not heard or seen anything from the Archdiocese about counting procedures. (Def.'s Reply at 14.) Defendant's objection to line 11 is sustained.  As to lines 12-13, Defendant objects on the grounds that the statement contradicts McFadden's deposition testimony, in which she stated she did not recall what plaintiff said when they were told to move the counting to the conference room. (Def.'s Reply at 14-15.)  As an initial matter, Defendant did not provide page 80 of Ms. McFadden's testimony, so the Court is not in a position to sustain the objection.  Moreover, even if Ms. McFadden testified that she did not remember exactly what Plaintiff said, she may still recall that Plaintiff never said what Fr. Mark accuses her of saying.

Accordingly, except for as explicitly provided above, Defendant's objections to Ms. McFadden's declaration are overruled.

### IV. CONCLUSION

In light of the foregoing, Defendant's motion for partial summary judgment is GRANTED IN PART AND DENIED PART.  Specifically, the motion is granted as to the third cause of action for age discrimination, and is denied as to the first and second causes of action for gender and race discrimination.

IT IS SO ORDERED.

Dated: January 7, 2015

KANDIS A. WESTMORE
United States Magistrate Judge